IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.

MICHAEL GRANT CLINESMITH,

        Defendant.

Case No. 23-20063-01-DDC

### MEMORANDUM AND ORDER

The government seeks to admit a co-conspirator statement at defendant Michael Clinesmith's trial under Fed. R. Evid. 801(d)(2)(E). The court, based on the evidence presented at a *James*[1] hearing, grants its request.

"Before admitting statements into evidence under the coconspirator exception to the hearsay rule, the district court must determine by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy." *United States v. Alcorta*, 853 F.3d 1123, 1137 (10th Cir. 2017). To make this factual determination, the court, following our Circuit's preferred procedure, held "a *James* hearing outside the presence of the jury to determine whether the predicate conspiracy existed." *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995) (quotation cleaned up).

---

[1] "A *James* hearing is an evidentiary hearing to establish the existence of a predicate conspiracy for purposes of Rule 801(d)(2)(E)." *United States v. Otuonye*, 995 F.3d 1191, 1204 n.14 (10th Cir. 2021) (referencing *United States v. James*, 590 F.2d 575 (5th Cir. 1979)). A *James* hearing is our Circuit's preferred procedure for making Fed. R. Evid. 801(d)(2)(E)'s required preliminary findings. *United States v. Stein*, 985 F.3d 1254, 1269 (10th Cir. 2021).

At the *James* hearing, the government sought admission of one co-conspirator statement: a statement by Mr. Clinesmith's co-defendant, Richard Mueller. Mr. Mueller reportedly will testify at trial that, in 2004, Mr. Mueller and his father, Ray Mueller Jr., met at the Mueller Machine & Tool (MMT) facility in St. Louis. *See* Doc. 107. During their meeting, Ray told his daughter, Debbie Duvall, and Mr. Mueller that he'd agreed to pay Mr. Clinesmith for design work on Honeywell gages in exchange for Mr. Clinesmith steering Honeywell gage-design and gage-build contracts to MMT. *Id.*

To admit this statement, the government presented testimony by a special agent with the Department of Energy Office of Inspector General, a recorded interview of Mr. Clinesmith, and several exhibits. The court summarizes each, below.

## I.      Evidence

The special agent testified that Mr. Mueller described the following conspiracy: Mr. Clinesmith would provide designs for Honeywell gages to MMT, MMT would pay him, and Mr. Clinesmith would steer Honeywell gage builds to MMT. Mr. Mueller also told the special agent about the 2004 conversation with his father, Ray. Ray told Mr. Mueller and Ms. Duvall that Mr. Clinesmith would design gages for them, and then they would get Honeywell gage contracts. The special agent testified MMT didn't pay Mr. Clinesmith when he finished the gage designs. Instead, Mr. Clinesmith got paid when Honeywell awarded the contract to and paid MMT. According to the special agent's testimony, Mr. Mueller explained that he wanted a guarantee that MMT would get the gage-build contracts.

The government also played a recorded interview with Mr. Clinesmith. In this interview, Mr. Clinesmith explains that, about 20 years ago, "design agencies knocked on our door with product materials that could not be measured with normal conventional methods[.]" Doc. 89-1 at 14 (Clinesmith Interview 13:8–13:14). He couldn't develop the capabilities at Honeywell. *Id.* at

15 (Clinesmith Interview 14:1–2). He saw an opportunity to make money on the difficult work. *Id.* at 15 (Clinesmith Interview 14:3–5).

Mr. Clinesmith "came up with some ideas[.]" *Id.* at 14 (Clinesmith Interview 13:14–16). He then went to two or three vendors. *Id.* (Clinesmith Interview 13:16–18). Mr. Clinesmith told vendors that they couldn't do the design, so they would "work a deal" where Mr. Clinesmith would send the vendors quotes. *Id.* at 15 (Clinesmith Interview 14:14–20). After quoting these vendors, Mr. Clinesmith ultimately landed on MMT, a much bigger outfit that listened to him and made his requested investments. *Id.* at 15–16 (Clinesmith Interview 14:23–15:17).

In the interview, Mr. Clinesmith confirmed that his first contact with MMT was with Ray. *Id.* at 37 (Clinesmith Interview 36:6–14). When visiting MMT, Mr. Clinesmith had told Ray that they need to make changes and Ray expressed interest. *Id.* at 38 (Clinesmith Interview 37:3–8). In response, Mr. Clinesmith told Ray he wouldn't mind doing some design work for MMT. *Id.* (Clinesmith Interview 38:8–11). And Ray told Mr. Clinesmith, "[S]ure that's not a problem." *Id.* (Clinesmith Interview 38:11–12).

Later in the interview, Mr. Clinesmith described how his agreement with MMT worked. If MMT planned to make a gage, then Mr. Clinesmith would send them a design for the gage. *Id.* at 45 (Clinesmith Interview 44:6–10). Mr. Clinesmith then would send MMT an invoice and they'd pay him directly. *Id.* at 46 (Clinesmith Interview 45:4–10). And he confirmed that MMT wouldn't pay him until Honeywell paid MMT. *Id.* (Clinesmith Interview 45:11–20). He also explained that his agreement was a handshake deal with Ray and Mr. Mueller. *Id.* at 47 (Clinesmith Interview 46:6–9).

The government, through the special agent who testified, also admitted several exhibits:

- A January 27, 2019 email from Mr. Clinesmith's personal email to MMT, to which Mr. Clinesmith attached a gage buyout list—a list of components needed to build

3

gage 3R0500-GA1. Gov. Ex. 701. In the buyout list, Mr. Clinesmith included a price for his design work, a price for his role in the build, and Honeywell's internal budget for the gage. *Id.* MMT had not yet submitted a quote to design and build the gage.

- A February 27, 2019 email from a tool designer at Honeywell Tooling and Logistics to Mr. Clinesmith's Honeywell email, asking Mr. Clinesmith to approve MMT's pricing for gage 3R0500-GA1-A. Gov. Ex. 703. Mr. Clinesmith approved MMT's quote. *Id.* This is for the same gage that Mr. Clinesmith designed for MMT.

- An August 5, 2019 email from Mr. Clinesmith's Honeywell email address directing Honeywell Tooling and Logistics to send a quote for gage DEV GK 520 to MMT. Gov. Ex. 1001.

- An August 8, 2019 email from Mr. Clinesmith to Mr. Mueller explaining that he was going to charge MMT $6,000 for his manufacturing work on the gage and alerting MMT that it would receive a request for quote from Honeywell. Gov. Ex. 1000.

- A November 13, 2019 email from Mr. Clinesmith to Mr. Mueller and Ms. Duvall listing invoices for several gages. Gov. Ex. 202. The email indicates that Honeywell had approved these gages. *Id.* And the invoice attached is directed to "Ray Mueller Jr." *Id.*

- A February 20, 2020 email between Mr. Clinesmith's personal email account and Mr. Mueller at MMT about the GK 520 design in which Mr. Clinesmith sent Mr. Mueller an invoice for Mr. Clinesmith's design on GK 520. Gov. Ex. 1002.

- A November 5, 2020 email from Mr. Clinesmith's Honeywell email account to Honeywell Tooling and Logistics where Mr. Clinesmith tells Tooling and Logistics to send a gage-build contract for DEV GK 5201 to MMT because MMT had a design— a design Mr. Clinesmith had prepared himself. Gov. Ex. 1003.

- An MMT vendor ledger, listing all payments that MMT made to DataGen from January 2005 to December 2020. Gov. Ex. 1206. DataGen is Mr. Clinesmith's company. Doc. 89-1 at 47 (Clinesmith Interview 46:18–20). The vendor ledger demonstrates that MMT paid Mr. Clinesmith over $1 million. Gov. Ex. 1206.

With this evidence in mind, the court turns to the legal analysis and its factual findings.

## II. Analysis

Recall the three elements of the co-conspirator exception to the hearsay rule: (1) a conspiracy existed, (2) the declarant and the defendant both belonged to the conspiracy, and (3) the declarant made the statement in the course of and in furtherance of the conspiracy. *Alcorta*,

853 F.3d at 1127. Mr. Clinesmith challenges only the first element: whether a conspiracy existed. The court devotes most of its attention to that element, then briefly considers the other two requirements to determine whether the government has satisfied each element by a preponderance of the evidence.

*First*, did a conspiracy exist? The government must adduce "some independent evidence linking the defendant to the conspiracy—that is, evidence other than the proffered co-conspirator statements themselves—but that evidence need not be substantial." *Otuonye*, 995 F.3d at 1204 (quotation cleaned up). In the proffered statement, Mr. Mueller's father, Ray, told him about a just-hatched conspiracy with Mr. Clinesmith in which Mr. Clinesmith would do paid design work for MMT and steer Honeywell gage contracts to MMT. Independent evidence links Mr. Clinesmith to this conspiracy. In his interview, Mr. Clinesmith himself explained that he'd started his relationship with MMT when he met Ray about 20 years ago. He called it a handshake deal. Mr. Clinesmith also said that he'd offered to do gage work for MMT because MMT couldn't do the difficult gage design but was willing to make the necessary investments. MMT's vendor list shows that MMT paid Mr. Clinesmith from 2005 to 2020. The emails also demonstrate each piece of the conspiracy:

- Mr. Clinesmith giving MMT a gage buyout list, his own price for the design, and Honeywell's internal budget for the gage;
- Mr. Clinesmith, in his capacity at Honeywell, approving MMT's bid for a gage he designed;
- Mr. Clinesmith directing Honeywell to send a request for quote to MMT; and
- Mr. Clinesmith billing MMT and getting paid for his gage-design work.

The court thus has no trouble concluding that a conspiracy existed. The independent evidence confirms the existence of the very same conspiracy Ray described to his son at the conspiracy's inception.

Mr. Clinesmith complains that some of the emails come from 2019 and 2020, many years after the 2004 statement. But this argument ignores MMT's vendor ledger, which demonstrates a steady stream of payments from MMT to DataGen—Mr. Clinesmith's company—between 2005 and 2020. True, the vendor ledger doesn't say explicitly why MMT paid DataGen. But Mr. Clinesmith hasn't proffered any other explanation for these payments. The evidence establishes and the court infers by a preponderance of the evidence that MMT made these payments to Mr. Clinesmith for gage-design work. And Mr. Clinesmith himself told investigators that the arrangement started about 20 years ago. The court thus finds that the government has demonstrated, by a preponderance of the evidence, that a conspiracy existed.

*Second*, the court must determine whether the declarant and the defendant were both members of the conspiracy. This is a simple one. Ray—who used to run MMT—told Mr. Mueller that he'd talked to Mr. Clinesmith. And Mr. Clinesmith himself confirmed that he'd worked with Ray.

*Last*, the court must determine whether Ray made this statement in the course of and in furtherance of the conspiracy. Ray made the statement about this new deal *after* he'd hatched the plan with Mr. Clinesmith, so the statement came in the course of the conspiracy—indeed at its inception. And statements "by a conspirator are in furtherance of the conspiracy when they are 'intended to promote the conspiratorial objectives.'" *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (quoting *United States v. Reyes*, 798 F.2d 380, 384 (10th Cir. 1986)). "For instance, statements that explain events of importance to the conspiracy in order to

6

facilitate its operation are considered to be in furtherance of the conspiracy." *United States v. Smith*, 833 F.2d 213, 219 (10th Cir. 1987). "Statements of a coconspirator identifying a fellow coconspirator are considered to be made in furtherance of the conspiracy." *Id.* (quotation cleaned up). The evidence here about the statement attributed to Ray meets this definition. Ray told his children, both of whom appear to have worked for MMT, the identity of the person who would do gage-design work for MMT and steer Honeywell contracts to MMT. The statement also facilitated the goal of the conspiracy. According to the special agent, Mr. Mueller has explained that, after the discussion with his dad, he started working on things necessary to carry the agreement to affect. And Ms. Duvall, for her part, would handle invoices and payments to Mr. Clinesmith. The court thus finds that Ray made his statement to Mr. Mueller and Ms. Duvall in furtherance of the conspiracy.

### III.     Conclusion

The court finds that the government has demonstrated, by a preponderance of the evidence, the necessary requirements to admit Mr. Mueller's testimony about Ray's statement under the co-conspirator exception to the hearsay rule. Fed. R. Evid. 801(d)(2)(E). This finding also means that the court grants the government's sixth topic in its Omnibus Motion in Limine (Doc. 89).

**IT IS THEREFORE ORDERED BY THE COURT THAT** the government's sixth topic in its Omnibus Motion in Limine (Doc. 89) is granted.

**IT IS FURTHER ORDERED THAT** the government has sustained its burden to demonstrate that the statement at issue is a co-conspirator statement under Fed. R. Evid. 801(d)(2)(E).

**IT IS SO ORDERED.**

**Dated this 6th day of October, 2025, at Kansas City, Kansas.**

                                    **s/ Daniel D. Crabtree**
                                    **Daniel D. Crabtree**
                                    **United States District Judge**