**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

UNITED STATES OF AMERICA,

                       **Plaintiff,**

v.

MICHAEL GRANT CLINESMITH,

                       **Defendant.**

Case No. 23-20063-01-DDC

---

## <u>MEMORANDUM OPINION</u>

This opinion memorializes the court's reasons for overruling defendant Michael Grant Clinesmith's Objection No. 5. The court assumes the reader's familiarity with the facts of the case, but briefly summarizes those facts before it begins the analysis.

The government charged defendant with one count of conspiracy to commit wire fraud and honest-services wire fraud and four counts of wire fraud and honest-services wire fraud. Doc. 1 at 9–12. Highly summarized, at trial, the government proved a scheme between defendant and Mueller Machine and Tool (MMT) to defraud defendant's employer, Honeywell Federal Manufacturing & Technologies. Defendant used his position as a long-tenured gage engineer at Honeywell to steer valuable gage contracts to MMT, an outside gage vendor. Defendant told Honeywell that only MMT could build the complex gages. But defendant himself was doing the work for MMT—secretly. More than 20 years ago, defendant and the former owner of MMT, Ray Mueller, had agreed that defendant would design gages for MMT, and MMT would use those designs to bid for Honeywell gage contracts. In exchange, defendant agreed to steer gage contracts from Honeywell to MMT. MMT compensated defendant well; he

made more than a million dollars from this scheme over its course.  The jury convicted defendant of all counts.

At sentencing, defendant objected to the proposed 14-level enhancement under Guidelines § 2B1.1(b)(1)(H).  Doc. 141 at 30 (PSR ¶ 147).  Section 2B4.1 requires the court to increase a defendant's offense level based on (i) the value of the kickback or (ii) the value of the improper benefit to be conferred—using whichever value is greater.  U.S.S.G. § 2B4.1(b)(1). Here, the PSR doesn't characterize whether the number used for offense-level purposes represents the value of the kickback or the value of the improper benefit conferred.  Doc. 141 at 12 (PSR ¶ 42).  Instead, it uses a value of $1,250,900 and adds 14 levels.  *Id.*  Defendant's objection to this enhancement is something of a moving target.  He makes different arguments between the objection preserved in the PSR and his four distinct sentencing memoranda.

The court first evaluates the value of the kickback.  It then considers the value of the improper benefit conferred.

## I.    Value of the Kickback[1]

In its supplemental sentencing memorandum, the government values the kickback at $1.1 million.  Doc. 157 at 1.  This is slightly different from its valuation in the PSR, which claimed a kickback of $1,250,900.  Doc. 141 at 31 (PSR ¶ 151).  This difference between these two numbers doesn't really matter for sentencing purposes, but the court uses the $1.1 million figure in its analysis.

---

[1]    The parties use the terms "bribe" and "kickback" interchangeably.  *See, e.g.*, Doc. 157 at 1 ("bribes/kickbacks"); Doc. 158 at 3 ("bribes or kickbacks").  This approach makes sense; the two terms mean similar things.  *Compare Kickback*, Black's Law Dictionary (12th ed. 2024) ("A sum of money illegally paid to someone in authority, esp. for arranging for a company to receive a lucrative contract[.]"), *with Bribe*, Black's Law Dictionary (12th ed. 2024) ("A price, reward, gift or favor given or promised with a view to pervert the judgment of or influence the action of a person in a position of trust.").  The court finds kickback fits these facts best, so it uses that term here.  But, ultimately, this is purely a semantic distinction without legal significance.

Defendant argues that the $1.1 million isn't a kickback because the figure represents MMT's payments for his design services. The court begins with this argument. Alternatively, defendant claims that he's entitled to a credit against the $1.1 million. Doc. 141 at 30 (PSR ¶ 148). For support, he cites § 2B1.1's "Credits Against Loss" comment. *Id.* As relevant here, that comment provides that the court should reduce a "loss" by the "money returned, and the fair market value of the property returned and the services rendered, by the defendant[.]" § 2B1.1 cmt. n.3(D)(i). The court takes up this issue, second.

## A.    The Payments Were Kickbacks

Defendant first argues that the payments he received from MMT weren't kickbacks at all and, instead, represented a fair, market-rate payment for legitimate engineering and design services he supplied to MMT. He argues that the government has failed to show that these payments from MMT to defendant were kickbacks, rather than payments for defendant's "legitimate work." Doc. 158 at 3. He contends that nothing in the record shows "that the payments to Clinesmith were for anything other than legitimate design and engineering work." *Id.* Defendant's recasting of the payments doesn't persuade the court.

Unfortunately for defendant, the government has an ace in its hand: the jury's verdict. The jury found defendant guilty of honest-services wire fraud and conspiracy to commit honest-services wire fraud. Doc. 130 at 1–3 (Verdict). In an honest-services-wire-fraud case, a private employee has "breached his allegiance to his employer by accepting bribes or kickbacks in the course of his employment." *Skilling v. United States*, 561 U.S. 358, 401 (2010) (quotation cleaned up). So, the jury found—as an element of the crime—that defendant accepted a kickback. Defendant's argument is a misguided attempt to rehash his failed trial defense and recharacterize his conduct as just a mistake where he failed to disclose his relationship with MMT on his annual Honeywell conflict-of-interest disclosure. The jury rejected this defense and

3

found that MMT paid a kickback.[2]  To find otherwise at sentencing would revise the jury's verdict.

Defendant's co-conspirator and co-defendant, Richard Mueller, testified about the origins of the scheme:  Richard's father, Ray Mueller, advised that defendant had agreed to give MMT Honeywell's gage work and defendant would do the design work for those gages.  Doc. 134 at 227 (Tr. 403:2–16).  Under the scheme, defendant also would do the complex designing and "make sure [MMT] g[ot] the builds for those."  *Id.*  Yet MMT was capable of doing some of its own design work.  But, Richard Mueller testified, MMT paid defendant for work MMT could've done "to ensure that we would get more" Honeywell gage contracts.  *Id.* at 235 (Tr. 411:6–16).  And defendant didn't do any work from MMT's other customers; he only did Honeywell work.

Lest there be any doubt that contract steering was the gist of this illegal bargain, MMT refused to pay defendant until Honeywell paid MMT for gages that MMT actually sold to Honeywell.  Richard Mueller testified that MMT used this arrangement for the "pressure" it brought to bear—*i.e.*, "to make sure that we got the build and additional work."  *Id.* at 241 (Tr. 417:17–24).  Richard Mueller also testified that defendant complained about this arrangement "[m]any, many times."  *Id.* at 241–42 (Tr. 417:25–418:2).  But the arrangement—and its "pressure" on defendant to deliver Honeywell contracts—remained.  Defendant emphasizes that his co-conspirator, Richard Mueller, testified that there was "no guarantee" that MMT would get a job if defendant provided a personal design estimate.  Doc. 135 at 75 (Tr. 547:15–18).  But

---

[2]     Strict proceduralists might wonder why this argument—that the payments weren't kickbacks—would come up at sentencing because it seems like a challenge to the jury's verdict and thus better suited to a motion under Fed. R. Crim. P. 29.  Yet defendant never moved for acquittal on this basis.  Indeed, he didn't make any specific arguments in his motion for a judgment of acquittal.  *See* Doc. 147.  Regardless whether this argument is a day late, it's certainly a dollar short.

MMT wasn't paying defendant for a guarantee. It paid defendant to use his influence inside Honeywell to deliver gage contracts to MMT. And he did so.

In sum, MMT paid defendant kickbacks.[3]

### B.     The Payments to Defendant for his Design Work are Inseparable from the Kickbacks

The court also finds that the amounts MMT paid defendant can't be separated between any payments for design services and the kickbacks. The two are inseparable. This finding dooms defendant's argument that he's entitled to a credit against the $1.1 million because MMT paid him that money, at least in part, for his design services.

This inseparability has its legal roots in *United States v. Glick*, 142 F.3d 520 (2d. Cir. 1998). There, the defendant worked as an insurance broker, selling health-insurance plans for a union. *Id.* at 522. Defendant then engaged a sub-broker to market the union's health plan. *Id.* at 523. Shortly after defendant had engaged the sub-broker, the union's president asked defendant to pay him a fee for each participant who enrolled in the health plan through the sub-broker. *Id.*

---

[3]     This jury's finding of kickbacks kicks up trouble for defendant's sentencing expert, Chris Spies. The court calls him a sentencing expert because it excluded Spies from testifying at trial. Doc. 123. At sentencing, Spies testified that defendant charged MMT a reasonable design fee. Spies also concluded that the total cost of defendant's charges to MMT represented fair, market-value rates. But, based on the jury's finding of a kickback, the court can't agree with Spies that MMT merely paid defendant a market rate for his designs. Some part of that payment was a kickback.

The court also agrees with the government that Spies isn't a very helpful expert. He's never designed a gage for nuclear weapons. Doc. 152 at 41 (Sentencing Tr. 41:5–10). And he used $200 for defendant's hourly rate because that's the number defense counsel provided him. *Id.* at 46 (Sentencing Tr. 46:16–23). Spies conceded that he had little familiarity with market rates for specialty gages designed for nuclear-weapons parts and based his opinions on rates for "specialty engineering services." *Id.* (Sentencing Tr. 46:1–8). Spies also didn't know how long it took defendant to work on the relevant gates. *Id.* at 47 (Sentencing Tr. 47:2–13). Though defendant had designed gages for nuclear weapons for decades and Spies never had designed a gage before, Spies testified that he thought he could design a gage within "a reasonable percentage of what [defendant] would do it in." *Id.* at 49 (Sentencing Tr. 49:6–14). The court finds this testimony unhelpful, especially in light of (i) the jury's verdict and (ii) the court's finding that the kickbacks are inseparable from any payment made for defendant's design services.

In exchange, the union president would allow defendant to continue using the sub-broker. *Id.* But those payments to the union president were illegal. *Id.* From these illegal payments, defendant earned $1 million in commissions from the sub-broker's sales. *Id.* At sentencing, defendant argued that the $1 million didn't qualify as an improper benefit because he'd provided the health-plan "participants with valuable marketing services and legitimate health insurance." *Id.* at 526. The Second Circuit rejected this argument, finding a deduction inappropriate because the commissions on the sales were inseparable from the illegal payments. *Id.* The Second Circuit emphasized that there "was no part of [defendant's] transactions with the Plan participants that was legitimate." *Id.*

So too here. Defendant designed gages for MMT to sell Honeywell, but he got paid for his design only after he successfully had steered the gage contract to MMT. The scheme was a circle of trust, albeit an illegal circle. If one part of the circle fell away, the scheme failed. Here's what the court means: Defendant did some gage-design work for MMT. MMT put its name on those designs and submitted them as a proposal to Honeywell. Defendant used his position within Honeywell to steer Honeywell to choose MMT as the contracted provider of the gage to Honeywell. MMT produced the gages and Honeywell paid MMT. When MMT got paid, MMT paid the defendant. If Honeywell didn't award the contract to MMT, MMT didn't get paid. Neither did defendant. The court thus finds that MMT paid defendant to influence him improperly, and those payments are inseparable from any payment for defendant's design services. As in *Glick*, no part of defendant's transactions with MMT was legitimate.

Defendant fights this conclusion, pretending that there was little wrong with his relationship with MMT other than his failure to disclose it to Honeywell. That was his trial defense. The jury didn't buy it. The jury found that defendant had defrauded Honeywell to

deprive it of its money and the honest services of its employee—defendant.  Defendant and his
co-conspirators misrepresented MMT's gage-design capabilities to Honeywell and lied to
Honeywell about who had completed the design work.  Defendant gave MMT inside information
about Honeywell that—in defendant's own words—conferred a "tremendous advantage" to
MMT over its competitors.  Doc. 89-1 at 243–44 (Tr. 419:10–420:4).  Indeed, defendant gave
MMT "a job buyout list with prices, part numbers and descriptions."  *Id.* at 244 (Tr. 420:8–14).

Defendant asserts that the court can't use the $1.1 million figure because he deserves a
credit for his gage-design services.  Critical to defendant's theory of a credit for his services is
*United States v. McClatchey*, 316 F.3d 1122 (10th Cir. 2003).  *McClatchey* involved a scheme
where a hospital paid two doctors—the LaHues—to refer patients to the hospital.  *Id.* at
1125.  The defendant, McClatchey, was the hospital's COO.  *Id.*  The hospital paid the LaHues a
yearly salary to work as directors at the hospital.  *Id.*  The LaHues also operated a separate
medical practice.  *Id.*  After the hospital and the LaHues executed a contract for the LaHues to
serve as directors, the LaHues started referring a ton of patients to the hospital.  *Id.*  But the
LaHues performed "minimal" services for the hospital.  *Id.*  Indeed, a new lawyer for the hospital
came on the scene and realized that the LaHues weren't performing the services specified in their
contract.  *Id.*

At sentencing, the district court used § 2B4.1 to calculate McClatchey's offense level.  *Id.*
at 1127.  On appeal, the parties, importantly, "agree[d] that the amount of the bribe should be
calculated as the amount paid to the LaHues less the value of the lawful services they
provided."  *Id.*  The district court found that the bribe the hospital paid to the LaHues amounted
to $50,000.  *Id.*  The district court arrived at this figure using this approach:  the hospital paid the
LaHues $150,000 annually and the LaHues rendered $100,000 worth of services.  *Id.* at 1129.

So, $50,000 represented the amount of money paid to the LaHues each year as a bribe. *Id.* The government disputed this approach on appeal, insisting that the entire $150,000 qualified as a bribe because the LaHues had performed virtually no services. *Id.* The Circuit disagreed with the government, and found that evidence in the record supported the district court's conclusion that the LaHues had rendered $100,000 worth of services.

From *McClatchey*, defendant concludes that the court must deduct the value of his legitimate services when calculating the kickback's value. The court disagrees with his argument. *McClatchey* doesn't hold that the court must deduct the value of "lawful services" from the kickback. Instead, the *McClatchey* parties *agreed* to use this standard, and the Circuit thus used it. *Id.* at 1127. The Circuit never adopted this standard as its own. And, in any event, *McClatchey* is factually distinct. The government cites the district court's opinion in a case involving a *McClatchey* co-defendant to demonstrate that "the district court was able to easily isolate payments that were for 'legitimate business transactions' from those that were for illegal patient referrals." Doc. 157 at 13 (quoting *United States v. Anderson*, 85 F. Supp. 2d 1084, 1106 (D. Kan. 1999)). Indeed, *Anderson* described transactions for things like a salary for a temporary employee, a lease, cars, phlebotomists, lab debts, a line of credit, and a proposed loan. *Anderson*, 85 F. Supp. 2d at 1106. The *Anderson* court concluded that the government had failed to show that these transactions were not part of an arms-length, legitimate agreement. *Id.*

Here, the court finds, none of the services defendant provided to MMT were part of an arms-length, legitimate agreement. There's no payment for a lease or a phlebotomist in this case's story. Nothing about the agreement between defendant and MMT was legitimate. It's not as if defendant was providing design services to MMT and getting paid by the hour. Instead, he prepared designs for MMT to use so that MMT's designs—really, defendant's designs—would

appeal to Honeywell's preferences.  This design work permitted defendant to confer an insider's advantage to MMT.  In doing so, he provided MMT a competitive advantage that improved its chances to secure Honeywell's gage contracts.  And, in turn, defendant improved his chances of getting paid by MMT.  So, while the *McClatchey* court could divide the bribe into proper and improper buckets based on the structure of the agreement, the court declines to do so here.  The scheme created an illegal circle of trust in which defendant got paid but only if he used his insider's knowledge and influence within Honeywell to send Honeywell contracts to MMT.[4]  To demonstrate this, here's a Project Tool Order in which defendant requests that one of Honeywell's departments select MMT to design and make a gage for Honeywell:

---

[4]    On the topic of inapplicable cases cited by defendant, the court also rejects defendant's reliance on *United States v. Hess*, 106 F.4th 1011 (10th Cir. 2024).  That case involved calculating loss to victims under Guidelines § 2B1.1.  *Id.* at 1023.  The court isn't calculating loss here.  It's calculating the value of the kickback and the value of the improper benefit conferred.  The court thus rejects defendant's attempt to turn this case into something it's not—a case where a sentencing enhancement turns on the amount of loss.

```
                    PROJECT TOOL ORDER
                    ------------------

Shop Order Number:     213516              PTO Date Prepared:  2017-09-01
Shop Order Revision:   0                   PTO Tool Adm Date:
                                           PTO Published Date:

Equipment Number:      3A3905-GA1          Equipment Class:
Equipment Revision:    A
Equipment Type:        KCP Gage            Drawing Class:
Disposition Class:
Order Type:
Equipment Desc:        Acceptance Gage

For Part Number:                           Priority Code:
Part Number Revision:
Part Class:                                Distribution Code:
Engineer Part Number: 3a3905
Engineer Part Class:  UNC
Engineer Rel Part:    3a3906

Accountable Use Cont: No                   Media:
Export Controlled:

Engineer Name:        Michael G Clinesmith
Engineer Index:       u55075  Department: 459    Phone: 816-488-5718

Order Quantity:       1
Serial Number:

ACO/FCO Number:       N/A                   Charge Number:      X1261100
                                            Charge Number Labor: X1261100
                                            Charge Number Material: X126110M
Equipment Required:   12/01/18              Department Charged:
Design Promised:                            Material Account:
Using Department:     412                   Labor Account:
Cost Estimate:                              Design Source:      Vendor Design
                                            Fab Source:         Vendor
Requisition Number:                         Requisition Date:

Pressure System:      No
Sensitive Equipment:  No
Certification:        No
Loop Closure:         No

Reason for Request:   Design & Make Acceptance gage to check all part GD&T
                      features for listed parts. Send Design & Make to Mueller.
                      Models to be designed in Solidworks.  Se attached quote for
                      cost estimates.
```

Gov. Ex. 402.  This is just one of many examples.  A Honeywell witness testified it was common for defendant to direct gage design and make to MMT.  Doc. 134 at 69 (Tr. 245:17–19).  Other gage engineers typically didn't do such directing.  *Id.* (Tr. 245:20–22).

Defendant insists that no witness testified that defendant's duties at Honeywell required him to produce gage designs.  Doc. 161 at 3.  Yet a Honeywell witness testified that defendant was involved in every step of the gage-design process.  Doc. 134 at 40 (Tr. 216:17–19).  And defendant's personnel records show that his job duties included "[d]esign of special gages to

meet product requirements." Doc. 157-1 at 2.[5]  Defendant's performance review in 2000 provides that defendant was "successfully providing gage services in design, build, maintenance and consulting for gage requirements." *Id.* at 3.  In a 2021 interview, defendant said, "Gage engineering is responsible for building custom gages that are used to validate the parts and the methods that we use[.]"  Doc. 89-1 at 20 (Interview Tr. 19:1–4).  In an interview, defendant also described his role this way:

> So then they give me the drawing and I mark it all up and go, this is not right.  You drew that wrong.  That isn't going to work. . . .  And . . . I interrogate the design agency engineer to try and understand really how this works or how it's fit together.  And once they tell me, I express it on the drawing, I scratch up the drawing and say, you got that all wrong.  Using something called . . . geometric dimensioning and tolerancing through a spec ASMEY 14.5.  So I mark all that up.

*Id.* at 21 (Interview Tr. 20:8–19).  Sounds an awful lot like design work.

True, Honeywell used external vendors for complex gages.  But defendant himself suggested that he saw the external vendors as an opportunity to make money.  In his interview with agents, the defendant explained that some scientists had requested inspection of things for which they couldn't use normal methods.  Doc. 89-1 at 22 (Interview Tr. 21:9–17).  Defendant and these outsiders agreed that the project would cost $2 million.  *Id.* (Interview Tr. 21:20–25).  Defendant then told the scientists that they "might be able to go outside." *Id.* at 23 (Interview Tr. 22:1–2).  Defendant explained his motivation for going outside Honeywell this way:

> Now some would think, are you want[ing] to go outside so you can make money on it.  Like, well, you know, I don't mind that idea, but there's, and we can do your $2 million cut and paste and do it.  And it's going to take a long time because it's got to go through a whole bunch of rigmarole.  Paperwork stuff.  But anyway, so it ends up I go to Mueller and I say, listen, . . . if we do this design and this, that and the other, we can build this and whatever.

---

[5]     Defendant complains about the government "attaching decades-old records that were not admitted into evidence[.]"  Doc. 161 at 4.  He asks the court to "summarily reject[]" these records.  *Id.* He cites no legal authority to support this request.  The court declines to reject these records.

*Id.* (Interview Tr. 22:2–12).

Defendant nevertheless cries foul, asserting that he never could've designed the relevant gages as part of his job at Honeywell.  Doc. 161 at 1.  But defendant's argument misunderstands the government's theory about how defendant deprived Honeywell of his honest services.  It's about the information.  Defendant, thanks to his Honeywell job, was intimately involved in gage design, development, and manufacturing.  This inside position furnished him a wealth of insider information—information necessary to his job.  Defendant betrayed Honeywell by providing that information to MMT.  Defendant and MMT misled Honeywell into thinking that MMT could do the gage work when MMT could not.  In so doing, the conspirators fraudulently induced Honeywell to give MMT gage contracts and deprived Honeywell of the honest services of its employee.

The court thus finds that MMT's payments to defendant are inseparable from the kickbacks MMT paid defendant to steer gage contracts.  And so it values the kickback at $1.1 million.  It next considers the value of the improper benefit conferred.

## II.      Value of the Improper Benefit Conferred

Recall that the court must use the *greater* of the value of the kickback compared to the value of the improper benefit conferred.  U.S.S.G. § 2B4.1(b)(1).  Section 2B4.1 defines the value of the improper benefit to be conferred as "the value of the action to be taken or effected in return for the bribe."  § 2B4.1 cmt. n. 2.  In defining this term, § 2B4.1 refers to the commentary for § 2C1.1.  The relevant commentary for § 2C1.1 provides that the "value of 'the improper benefit received or to be received' means the net value of such benefit."  § 2C1.1 cmt. n.3.  The Guidelines also provide a few helpful examples:

- A government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2,000; the value of the benefit received is $8,000.

12

- A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000.

*Id.*  Section 2C1.1 then concludes with a bright-line rule:  "Do not deduct the value of the bribe itself in computing the value of the benefit received or to be received."  *Id.*

The Second Circuit has defined improper benefit as "the net value of the benefit received, rather than the gross income received."  *United States v. Glick*, 142 F.3d 520, 525 (2d Cir. 1998).  Similarly, the Third Circuit has held that "benefit received" means "the net value, minus direct costs, accruing to the entity on whose behalf the defendant paid the bribe."  *United States v. Lianidis*, 599 F.3d 273, 275 (3d Cir. 2010).

Here, the government submitted a declaration of accountant Edward McCarthy, who provided accounting services to MMT from 1984 to 2022.  Doc. 148-1 at 2 (Revised McCarthy Decl. ¶ 2).  McCarthy calculated MMT's total net revenue for Honeywell gage subcontracts for which MMT paid defendant throughout the entirety of the scheme at $1,310,328.86.  *Id.* at 4 (Revised McCarthy Decl. ¶ 9.b.).  From this figure, he subtracted the direct costs of material, labor, and services.  *Id.* (Revised McCarthy Decl. ¶ 7).  He didn't include amounts paid to defendant as part of MMT's direct costs.  *Id.* (Revised McCarthy Decl. ¶ 8).[6]

This $1.3 million figure thus satisfies the governing standard:  net value minus direct costs.  McCarthy calculated MMT's total net revenue, then subtracted the direct costs.  And the $1.3 million figure is higher than the $1.1 million paid to defendant.  So, under § 2B4.1, the court must use the $1.3 million figure.

Defendant argues that, because his scheme with MMT provided Honeywell with a benefit—functioning gages at the lowest-available price—he's entitled to a credit.  Doc. 141 at

---

[6]    The government made Mr. McCarthy available for cross-examination during the sentencing hearing.  And defense counsel questioned him extensively.

31 (PSR ¶ 148).  But the improper-benefit analysis doesn't measure or count any benefit received by Honeywell.  It measures the improper benefit to MMT, as demonstrated by the examples from the Guidelines' commentary.[7]

Defendant also argues that the court should use MMT's gross profit in this calculation: $218,828.86.  Doc. 158 at 9.  But that's just wrong.  The $218,828.86 figure represents MMT's profit and includes MMT's payments to defendant.  Section 2C1.1's bright-line rule is to the contrary.  It provides:  "Do not deduct the value of the bribe itself in computing the value of the benefit received or to be received."  U.S.S.G. § 2C1.1 cmt. n. 3.  The court already has found that the payments to defendant were an improper kickback, so it can't deduct that figure from McCarthy's calculation of $1.3 million.

Defendant quibbles with McCarthy's accounting.  The court needn't consider these arguments.  Even assuming defendant successfully reduces McCarthy's $1.3 million figure, then the court would have to use the $1.1 million kickback figure.  For sentencing purposes, there's no difference between a $1.1 million figure and a $1.3 million figure.  The table in § 2B1.1 applies a 14-level increase for amounts between $550,000 and $1,500,000.  U.S.S.G. § 2B1.1(b)(1).  So, defendant can whittle away at the $1.3 million figure all he wants.  But in the end, it does him no good.

## III.    Conclusion

The court thus overruled defendant's Objection No. 5 and this Order explains why.

**IT IS SO ORDERED.**

---

[7]    To convict defendant of wire fraud, the government didn't need to show that the scheme caused Honeywell economic loss.  *Kousisis v. United States*, 145 S. Ct. 1382, 1392 (2025).  The same is true for honest-services wire fraud; it doesn't require the government to show economic harm.  *See United States v. Milovanovic*, 678 F.3d 713, 726–27 (9th Cir. 2012) (en banc).

Dated this 3rd day of March, 2026, at Kansas City, Kansas.

<u>s/ Daniel D. Crabtree</u>
Daniel D. Crabtree
United States District Judge